**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| Deirdre Edwards, | ) |
| | ) |
| Plaintiff, | ) Case No. 1:05-CV-109 |
| | ) |
| vs. | ) |
| | ) |
| Dialysis Clinic, Inc., | ) |
| | ) |
| | ) |
| Defendant. | ) |

O R D E R

        This matter is before the Court on Defendant Dialysis
Clinic, Inc.'s motion for summary judgment (Doc. No. 11).  For
the reasons set forth below, Defendant's motion is well-taken and
is **GRANTED.**

I. Background

        Plaintiff Deirdre Chabot asserts claims against
Defendant Dialysis Clinic, Inc. ("DCI") for interference with
rights protected by the Family and Medical Leave Act ("FMLA"), 29
U.S.C. § 2615, disability discrimination in violation of the Ohio
Civil Rights Act, Ohio Rev. Code § 4112.02(A), intentional
infliction of emotional distress, and invasion of privacy.  The
Court has subject matter jurisdiction over Plaintiff's FMLA claim
pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a)(2).  The
Court has supplemental subject matter jurisdiction over

Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because they are a part of the same case or controversy as her federal claim.  The Court also has original subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy is in excess of $75,000.  See Notice of Removal ¶¶ 2, 7 (indicating that Plaintiff is a citizen of the state of Ohio and that DCI is a Tennessee corporation with its principal place of business in Tennessee); Complaint Prayer for Relief (demanding $800,000 plus attorney's fees and costs).

DCI is a non-profit corporation that provides treatment to patients with end-stage renal disease and severe kidney disease.  Doc. No. 11, Hageman Aff. (Ex. 4) ¶ 2.  DCI operates a number of facilities throughout the country, including one in Portsmouth, Ohio where Plaintiff was employed.  Id.  Plaintiff began employment with DCI in February 2002 as a receptionist. Plaintiff's initial job responsibilities were typical for a receptionist, Plaint. Dep. Ex. 5, but eventually she added to her duties by performing some of the functions of a ward clerk, such as completing and filing patient charts, labeling lab tubes, and assisting during crisis situations.  Plaint. Dep. at 22. Plaintiff received a dollar an hour raise after she complained about picking up these extra duties.  Id. at 62.

2

The record shows that for the most part Plaintiff's employment was fairly routine from her date of hire until about November 2004. The Court notes that, overall, her annual evaluations reflect good to exceptional performance. See Plaint. Dep. Exs. 6, 8, 10. In addition to the raise for taking on extra responsibilities, Plaintiff received a $.38 per hour merit increase in February 2003 and a $.40 per hour merit increase in February 2004. Plaint Dep. Exs. 9 & 11.

Plaintiff testified that in 2002 she was diagnosed with bipolar disorder, panic disorder, eating disorder, post-traumatic stress disorder, and anxiety. Id. at 24. Plaintiff states that she informed her immediate supervisor, Amy Salisbury, of these various diagnoses in 2002. Id. at 26. Plaintiff testified that these conditions caused her to have difficulty sleeping and that she no longer deals well with stressful situations. Id. at 33. Plaintiff admitted, however, that none of these conditions prevented her from performing any of aspect of her work with DCI nor did they interfere with her ability to take of herself. Plaint. Dep. at 35.

Plaintiff testified that in November 2004, her eating disorder, anorexia, became worse and that her outpatient therapist recommended that she admit herself to a clinic in Pittsburgh where she could receive twenty-four hour a day treatment. Id. at 54. At her deposition, when asked whether she

3

requested FMLA leave, Plaintiff testified that she told
Salisbury:

> that I was strongly considering going, but I needed to
> know if I would be able to do the FMLA because it was
> going to be a minimum of one month's stay.  They could
> not give me when I would be dismissed from up there.

Id. at 56.  In response, according to Plaintiff, Salisbury told
her that she would "have to use any days I had, personal vacation
days, before I could kick into the FMLA."  Id.  Salisbury, on the
other hand, avers that she told Plaintiff that she would have to
use earned but unused vacation or bonus days as part of her
approved FMLA leave.  Salisbury Aff. (Doc. No. 11, Ex. 3) ¶ 3.
In any event Plaintiff decided not to admit herself to the clinic
in Pittsburgh because she did not want to use up her vacation
time and because she did not want her daughter to know that she
had an eating disorder.  Plaint. Dep. at 54-55.

On December 16, 2004, Plaintiff was summoned to a
meeting with Salisbury and the director of DCI's Portsmouth
facility, Andy Mazon.  The purpose of the meeting was to discuss
a series of sexually suggestive emails that Plaintiff had
exchanged with another co-worker, Danny Blevins.  Additionally,
Mazon and Salisbury discussed with Plaintiff some comments she
had made which raised workplace safety concerns among some of her
co-workers.[1]  Plaintiff claims that Mazon and Salisbury told her

---

[1]     Plaintiff had suggested that serial killer Jeffrey
Dahmer was "a very intelligent man who got very greedy and got

4

that from that point on she was required to stay in her office at
all times and not speak to anyone.  Plaintiff responded that she
could not continue working under those conditions and immediately
resigned.  Id. at 65.  Salisbury responded to Plaintiff's
resignation by attempting to clarify that she and Mazon did not
intend to forbid Plaintiff from talking to other staff members,
but rather to make clear that she should discuss her problems
with staff members in a manner that did not raise safety
concerns.  Salisbury also explained that they did not intend
Plaintiff to resign and that she could contact DCI to correct any
errors she perceived in Salisbury's letter.  Plaint. Dep. Ex. 4.
Plaintiff, however, did not take Salisbury up on her offer to
discuss the situation further because "I was very upset and I
felt that I didn't need to work for these people anymore."
Plaint. Dep. at 102.

---

caught."  Plaint. Dep. at 83-84.  Plaintiff also commented to a
co-worker that she had told her ex-husband that she was "going to
put him in the wood chipper and put him on my rosebushes because
he would be a much better father there than he would be doing
what he was doing."  Id.  Plaintiff admitted making both of the
these comments.  However, Plaintiff said she made the comment
about Dahmer in the context of wondering how long he could have
continued committing murders without getting caught.  Plaintiff
further said that she was joking about her ex-husband and that
her co-worker understood her comment as a joke.  Id. at 84-85.
Furthermore, if the Court understands Plaintiff's deposition
testimony correctly, during this meeting she told Mazon and
Salisbury that she was not responsible for her actions because of
her bi-polar disorder.  Id. at 65.

5

In addition to these incidents, Plaintiff claims that she was subjected to closer scrutiny than her co-workers, she was not given instructions on performing health care services, she was unfairly reprimanded, and that her performance evaluations contained false statements.  Plaintiff also claims that DCI retaliated against her by not paying her for earned but unused vacation and sick days.  Plaintiff's breach of privacy claim arises out of an incident in which Salisbury contacted her physician with concerns that Plaintiff was suicidal and might harm herself.  Plaint. Dep. at 51-53.

On January 28, 2005, Plaintiff filed a complaint against DCI in the Scioto County, Ohio Court of Common Pleas which asserted claims for interference with FMLA rights, disability discrimination, intentional infliction of emotional distress, and invasion of privacy.  DCI later removed the case to federal court on the basis of diversity jurisdiction and supplemental jurisdiction.

DCI now moves for summary judgment on each of Plaintiff's claims.  DCI argues that Plaintiff's FMLA interference claim fails because she never made an FMLA leave request.  DCI further points out that Plaintiff admits that she did not request FMLA leave because she did not want to use her vacation days and because she did not want her daughter to know about her eating disorder.  DCI contends that Plaintiff's

6

disability discrimination and retaliation claims fail because she
is not disabled within the meaning of Ohio Civil Rights and
because she did not suffer any adverse employment action. DCI
argues that Plaintiff's intentional infliction of emotional
distress claim is without merit because its conduct was not
extreme or outrageous as a matter of law. Finally, DCI argues
that Plaintiff's invasion of privacy claim should be dismissed
because its conduct in contacting Plaintiff's physician was not
unwarranted, offensive, or objectionable as a matter of law.

        DCI's motion for summary judgment is now fully briefed
and ready for disposition.

                    II. <u>Summary Judgment Standard of Review</u>

        Summary judgment is proper "if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(c). The evidence presented on a motion for summary judgment
is construed in the light most favorable to the non-moving party,
who is given the benefit of all favorable inferences that can be
drawn therefrom. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654
(1962). "The mere existence of <u>some</u> alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that

7

there be no <u>genuine</u> issue of <u>material</u> fact."  <u>Anderson v. Liberty</u>
<u>Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)(emphasis in original).  The
Court will not grant summary judgment unless it is clear that a
trial is unnecessary.  The threshold inquiry to determine whether
there is a need for trial is whether "there are any genuine
factual issues that properly can be resolved only by a finder of
fact because they may reasonably be resolved in favor of either
party."  <u>Anderson</u>, 477 U.S. at 250.  There is no issue for trial
unless there is sufficient evidence favoring the non-moving party
for a jury to return a verdict for that party.  <u>Id.</u>

     The fact that the weight of the evidence favors the
moving party does not authorize a court to grant summary
judgment.  <u>Poller v. Columbia Broadcasting System, Inc.</u>, 368 U.S.
464, 472 (1962).  "[T]he issue of material fact required by Rule
56(c) . . . to entitle a party to proceed to trial is not
required to be resolved conclusively in favor of the party
asserting its existence; rather, all that is required is that
sufficient evidence supporting the claimed factual dispute be
shown to require a jury or a judge to resolve the parties'
differing versions of the truth at trial."  <u>First National Bank</u>
<u>v. Cities Service Co.</u>, 391 U.S. 253, 288-89 (1968).

     Moreover, although summary judgment must be used with
extreme caution since it operates to deny a litigant his day in
court, <u>Smith v. Hudson</u>, 600 F.2d 60, 63 (6th Cir.), <u>cert.</u>

8

<u>dismissed</u>, 444 U.S. 986 (1979), the United States Supreme Court has stated that the "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986).  According to the Supreme Court, the standard for granting summary judgment mirrors the standard for a directed verdict, and thus summary judgment is appropriate if the moving party establishes that there is insufficient evidence favoring the non-moving party for a jury to return a verdict for that party.  <u>Id.</u> at 323; <u>Anderson</u>, 477 U.S. at 250.

Accordingly, summary judgment is clearly proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>, 477 U.S. at 322.  Significantly, the Supreme Court also instructs that the "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion" against a party who fails to make that showing with significantly probative evidence.  <u>Id.</u>; <u>Anderson</u>, 477 U.S. at 250.  Rule 56(e) requires the non-moving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."  <u>Id.</u>

Further, there is no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or similar materials negating the opponent's claim.  Id.  Rule 56(a) and (b) provide that parties may move for summary judgment "with or without supporting affidavits."  Accordingly, where the non-moving party will bear the burden of proof at trial on a dispositive issue, summary judgment may be appropriate based solely on the pleadings, depositions, answers to interrogatories, and admissions on file.

### III. Analysis

### A. FMLA Interference

The Family and Medical Leave Act prohibits employers from interfering with or restraining any rights provided to employees under its provisions.  29 U.S.C. § 2615(a).  In order to prevail on an interference claim, a plaintiff must establish that 1) he or she is an "eligible employee;" 2) the defendant is an "employer;" 3) the employee was entitled to leave under the FMLA; 4) the employee gave the employer notice of his or intention to take FMLA leave; and 5) the employer denied the employee benefits to which he or she was entitled.  See Hoge v. Honda of Am. Mfg., Inc., 384 F.3d 238, 244 (6th Cir. 2004).  DCI argues that Plaintiff's interference claim fails because she did not provide notice of her intention to take FMLA leave and

because it did not deny Plaintiff benefits to which she was entitled.  The Court agrees.

An employee has a relatively easy to burden to satisfy the notice requirement in an FMLA interference case: she is not required to expressly invoke the FMLA but rather is only required to give the employer enough information for the employer to realize that the she is requesting time off for a serious health condition.  Cavin v. Honda of Am. Mfg., Inc., 346 F.3d 713, 723 (6th Cir. 2004).  Nevertheless, in this case it is clear that Plaintiff never requested to take FMLA leave so that she could be admitted to the eating disorder clinic in Pittsburgh.  Plaintiff only told Salisbury that she was considering taking FMLA leave for that purpose and ultimately decided not to take FMLA leave. Plaint. Dep. at 55-57.

The Court notes that there may be some dispute whether Salisbury correctly informed Plaintiff about the relationship between her vacation days and her FMLA leave.  Plaintiff claims that Salisbury told her that she would have to use her earned vacation days before she took FMLA leave while Salisbury said that she informed Plaintiff that she would have to use her earned vacation as part of her FMLA.  An employer can be held liable for interference with FMLA entitlements if it incorrectly advises an employee regarding her leave rights.  Conoshenti v. Public Serv. Elec. & Gas Co., 364 F.3d 135, 142-43 (3rd Cir. 2004).  An

11

employer will not, however, be held liable for providing
incorrect information if its error did not prejudice the
employee.  Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81,
89 (2002).  In this case, assuming Salisbury did incorrectly
state the policy to Plaintiff, Plaintiff was not prejudiced by
the error because the effect was the same - whether she had to
use vacation before taking FMLA leave or as part of her FMLA
leave, a thirty-day stay at the clinic would have expended all of
her vacation and she wanted to save her vacation time.  Moreover,
Plaintiff said not revealing her eating disorder to her daughter
was another reason she declined to enter the clinic.   There is
no evidence that the alleged incorrect information had any effect
on Plaintiff's decision whether to take FMLA leave.  Accordingly,
Plaintiff has failed to demonstrate any interference with her
FMLA rights.

        Plaintiff contends, however, that DCI admitted in a
memorandum it circulated at about the time she inquired about
taking FMLA leave that it had been misapplying its FMLA polices.
She also claims that DCI allowed other employers to take FMLA
leave without having to use their vacation time as part of their
leave.  As DCI correctly replies, however, the memorandum
identified by Plaintiff, which is set forth in the footnote

12

below,[2] addresses the timing of conducting performance reviews of employees on FMLA leave and not the requirement to use vacation time as part of FMLA leave.  In addition, as DCI again correctly states, Plaintiff has failed to identify any employee who was not required to use earned vacation time as part of his or her FMLA leave.

Finally, Plaintiff claims for the first time in an affidavit attached to her memorandum in opposition that Salisbury told her that she could not use FMLA for treatment of an eating disorder.  Plaintiff, however, cannot withstand summary judgment by proffering an affidavit which contradicts her sworn deposition testimony.  Penny v. United Parcel Serv., 128 F.3d 408, 415 (6th Cir. 1997).  This affidavit is contradictory because Plaintiff's deposition is clear that personal considerations, rather than the

---

[2]     The memorandum in question was drafted by Andy Mazon and states in pertinent part:

> It has come to our attention that we have not been following DCI policy nor have we been notifying employees that we are to change their evaluation date by the number of non-paid days that they take off while on FMLA or other non-paid leave.  Effective immediately, any employee who takes FMLA leave or other non-paid leave (personal leave) will have their evaluation date moved forward by the number of non-paid days that they are off work.  Also, employees are required to submit an application for FMLA and other personal leave and to report to their supervisor every two weeks while off on leave.

Plaint.  Aff. Ex. A-6.

alleged unavailability of FMLA leave for her condition, caused her not to request FMLA leave.

Plaintiff has simply failed to raise any triable issue on her FMLA interference claim.  Accordingly, DCI's motion for summary judgment on Plaintiff's FMLA interference claim is well-taken and is **GRANTED**.  This claim is **DISMISSED WITH PREJUDICE**.

B. Disability Discrimination

Plaintiff claims that DCI violated the Ohio Civil Rights Act ("OCRA") by discriminating against her and constructively discharging her on the basis of disability.  In order to establish a claim of disability discrimination Plaintiff must establish that: 1) she was disabled within the meaning of the OCRA; 2) her employer took an adverse employment action against her; and 3) she could safely and substantially perform the essential functions of her position.  House v. Kirtland Capital Partners, 814 N.E.2d 65, 75 (Ohio Ct. App. 2004).  A person is disabled under the OCRA if she has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded by her employer as having such an impairment.  Id.  A disability is substantially limiting if the person is unable to perform a major life activity that the average person in the general population can perform or is significantly restricted as to the condition, manner or duration under which an individual can perform a

14

particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity. Sadinsky v. EBCO Mfg. Co., 730 N.E.2d 395, 398 (Ohio Ct. App. 1999). In determining whether an impairment is substantially limiting, the court should consider the nature and severity of the impairment, its duration or expected duration, and its permanent or long term impact. Id. An employer regards an employee as being disabled if: 1) she has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation; 2) has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or 3) has no physical or mental impairment but is treated by a covered entity as having a substantially limiting impairment. Swanson v. University of Cincinnati, 268 F.3d 307, 318 (6th Cir. 2001).[3] Finally, an employee is not disabled because she has been diagnosed with an impairment; rather, the employee is disabled when the impairment substantially limits a major life activity. Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 195 (2002).

---

[3] Swanson was decided under the Americans With Disabilities Act, but because the OCRA's disability discrimination provisions are patterned after the ADA, state courts are permitted use federal law for guidance. House, 814 N.E.2d at 76.

DCI argues that summary judgment in its favor is appropriate because Plaintiff is not disabled with the meaning of the OCRA because the record does not demonstrate that her impairments substantially limited any major life activity.  The Court agrees that the record does not establish that Plaintiff was disabled during the term of her employment with DCI.  Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 884 n.13 (6th Cir. 1996)(plaintiff must establish disability at the time of the alleged discriminatory act).  Plaintiff admitted in her deposition that her impairments did not impose any limitations on her ability to perform her job with DCI nor did they affect her ability to take care of herself.  Plaint. Dep. at 35.  Plaintiff did state that her impairments affect her ability to sleep, but as DCI correctly states, she has not shown that she is limited in comparison with an average person in the population.  Plaintiff testified that she cannot sleep for eight straight hours without waking up, Plaint. Dep. at 33, but that is hardly a substantially limiting condition.  Swanson, 268 F.3d at 316 ("While less than five hours sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population."); Boerst v. General Mills Corp., 25 Fed. Appx. 403, 407 (6th Cir. 2002)(holding the ability to sleep only two to four hours a night not a substantially limiting impairment).

16

There is no evidence that DCI or any if its management regarded Plaintiff as being disabled.  Although construed in the light most favorable to Plaintiff the record shows that DCI knew of Plaintiff's impairments, there is no evidence that DCI regarded the impairments as substantially limiting.  The Court notes that DCI increased Plaintiff's job responsibilities as time went by and that Plaintiff received good performance reviews. Even after Plaintiff quit, Salisbury's subsequent letter to Plaintiff reflects regret at her resignation.  Thus, the record reflects that DCI believed that Plaintiff was fully capable of performing her job.  There is no evidence that any manager, supervisor, or employee of DCI ever made derogatory remarks or otherwise commented unfavorably about Plaintiff's impairments. Indeed, according to Plaintiff's own testimony, the management and employees at DCI supported her and helped her deal with her impairments.  Plaint. Dep. at 26-32; compare with Ross v. Campbell Soup Co., 237 F.3d 701, 706 (6th Cir. 2001)(note in file referring to plaintiff as "back case" evidence that employer regarded plaintiff as disabled).  Plaintiff also complains that she received unwarranted discipline, unfair performance evaluations, and was subjected to closer scrutiny than other employees after DCI learned of her impairments.  However, because none of these incidents resulted in any loss of pay or benefits or other tangible consequence, they are not adverse employment

17

actions.  <u>Allen v. Michigan Dept. of Corrections</u>, 165 F.3d 405, 412 (6th Cir. 1999); <u>Morris v. Oldham County Fiscal Court</u>, 201 F.3d 784, 789 (6th Cir. 2001).  DCI's alleged banishment of Plaintiff to her office is not regarded as an adverse employment action.  <u>Akers v. Alvey</u>, 338 F.3d 491, 498-99 (6th Cir. 2003)(short-term harassment and ostracism not pervasive and thus could not support retaliation claim); <u>MacKenzie v. City and County of Denver</u>, 414 F.3d 1266, 1279 (10th Cir. 2005)("silent treatment" not an adverse employment action); <u>Jensen v. Potter</u>, 435 F.3d 444, 452 (3rd Cir. 2006)(same);  <u>Williams v. City of Kansas City</u>, 223 F.3d 749, 754 (8th Cir. 2000)(same).  The Court also notes that because Plaintiff's co-workers and supervisor were supportive of her and her impairments, according to her own testimony, this does not appear to be a situation where her employer's attitude about her changed after learning about her impairments.  <u>Compare with</u> <u>Flowers v. Southern Reg. Phys. Serv., Inc.</u>, 247 F.3d 229, 236-37 (5th Cir. 2001)(jury could have concluded that increased scrutiny and discipline of plaintiff after supervisor learned that plaintiff was HIV-positive could signal attitude change showing that employer regarded plaintiff as disabled).  More to the point, however, the record does not reflect a severe and pervasive atmosphere from which a reasonable person could conclude that DCI regarded Plaintiff as being substantially limited in any major life activity.

18

Finally, Plaintiff appears to claim that DCI retaliated against her by not paying her for earned but unused vacation and sick pay.  The record, however, does not support this contention either.  The document which apparently is supposed to substantiate this claim, Plaintiff Aff. Ex. A-7, appears to be a payslip dated April 23, 2005 from a company called Berk Family Enterprises, Inc.  Thus, other than Plaintiff's bare allegation, there is no evidence in the record that DCI wrongfully withheld benefits or payments due Plaintiff after her resignation.

Accordingly, DCI's motion for summary judgment on Plaintiff's disability discrimination claim is well-taken and is **GRANTED**.  This claim is **DISMISSED WITH PREJUDICE.**

### C. Intentional Infliction of Emotional Distress

Plaintiff also sues DCI for intentional infliction of emotional distress.  In order to prevail on a claim for intentional infliction of emotional distress, the plaintiff must establish that: 1) the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; 3) the actor's actions were the proximate cause of plaintiff's psychic injury and; 4) the mental anguish suffered by the plaintiff is serious

and of a nature that no reasonable person could be expected to endure it.  Fisher v. American Red Cross Blood Serv., 745 N.E.2d 462, 464 (Ohio Ct. App. 2000).  With regard to the extremity of behavior needed to support an intentional infliction of emotional distress claim, the Supreme Court of Ohio has stated:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Yeager v. Local Union 20, 453 N.E.2d 666, 671 (Ohio 1983)(citing Restatement (Second) of Torts (1965) § 73, Section 46, Comment d. Even if DCI's conduct could be described as discriminatory, which it was not, based on this record, it was not beyond all possible bounds of decency, atrocious, or utterly intolerable as matter of law.  See  Godfredson v. Hess & Clark, Inc., 173 F.3d 365, 375-76 (6th Cir. 1999)(terminating plaintiff because of his age not extreme and outrageous conduct);  Gallagher v. Croghan Colonial Bank, 89 F.3d 275, 278-79 (6th Cir. 1996)(transferring plaintiff because of her disability not extreme and outrageous conduct).

Accordingly, DCI's motion for summary judgment on Plaintiff's claim for intentional infliction of emotional distress is well-taken and is **GRANTED**.  This claim is **DISMISSED WITH PREJUDICE.**

### D. Invasion of Privacy

Finally, Plaintiff claims that DCI invaded her privacy when Salisbury called her doctor with concerns that Plaintiff was suicidal.  Plaintiff also claims that Salisbury demanded information, presumably medical records or some other diagnostic information, from her doctor.  Under Ohio law, "[a]n actionable invasion of the right of privacy is the unwarranted appropriation or exploitation of one's personality, the publicizing of one's private affairs with which the public has no legitimate concern, or the wrongful intrusion into one's private activities in such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." Sustin v. Fee, 431 N.E.2d 992, 993 (Ohio 1982)(citing Restatement (Second) of Torts § 652A).  In this case, Plaintiff's invasion of privacy claim falls into the fourth category - wrongful intrusion into one's private activities.  While the tort of invasion of privacy protects persons from having their medical information released without their consent, Rothstein v. Montefiore Home, 689 N.E.2d 108, 111-12 (Ohio Ct. App. 1996), there is no evidence in the record that Plaintiff's doctor actually provided any  information

21

to Salisbury.  The Court has not discovered any cases imposing liability for invasion of privacy where there was no actual disclosure of the plaintiff's medical information.  Without actual disclosure of information, the Court agrees with DCI that simply contacting a physician with concerns about a patient's safety, even if accompanied by a demand for information, would not as a matter of law outrage, shame, or humiliate a person of ordinary sensibilities.

Accordingly, DCI's motion for summary judgment on Plaintiff's invasion of privacy claim is well-taken and is **GRANTED**.  This claim is **DISMISSED WITH PREJUDICE.**

<u>Conclusion</u>

For the reasons stated, Defendant's motion for summary judgment is well-taken and is **GRANTED**.  The complaint is **DISMISSED WITH PREJUDICE.  THIS CASE IS CLOSED.**

**IT IS SO ORDERED**


Date March 22, 2006                    s/Sandra S. Beckwith
                              Sandra S. Beckwith, Chief Judge
                               United States District Court


22